No. 22-9000

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

**TEDOR DAVIDO**,
Appellant,

v.

**SECRETARY, PA. DEPT. OF
CORRECTIONS, et al.,**
Appellees.

_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania (Goldberg, J.) No. 06-0917,
denying capital habeas corpus relief

_____

REPLY BRIEF FOR APPELLANT

_____

LISA E. LEWIS
Chief Federal Defender

ERIC J. MONTROY
SONALI SHAHI
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106

*Counsel for Appellant Tedor Davido*

Dated: November 12, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

REPLY ARGUMENT .............................................................................1

I.    THE STATE COURT UNREASONABLY DETERMINED THAT TRIAL
      COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO MOVE TO
      SUPPRESS EVIDENCE DERIVED FROM THE WARRANTLESS
      ENTRY AND SEARCH OF THE DAVIDO HOME. ..................................2

      A.    The Pennsylvania Supreme Court's decision that there were exigent
            circumstances was contrary to and an unreasonable application of
            clearly established federal law..................................................4

      B.    Inevitable discovery should be decided *de novo*. .....................8

      C.    Deficient Performance..........................................................16

      D.    Prejudice.............................................................................17

II.   APPELLANT WAS DEPRIVED OF HIS SIXTH AMENDMENT
      RIGHT TO REPRESENT HIMSELF AT TRIAL .......................................18

CONCLUSION....................................................................................27

CERTIFICATE OF BAR MEMBERSHIP ...............................................1

CERTIFICATE OF COMPLIANCE.........................................................1

CERTIFICATE OF SERVICE ................................................................2

i

# TABLE OF AUTHORITIES

## Federal Cases

*Alabama v. White*, 496 U.S. 325 ............................................................ 7

*Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008) ....................................... 9

*Brigham City v. Stuart*, 547 U.S. 398 (2006) ..................................... 4, 5

*Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016) (en banc) ............. 8, 9, 10

*Illinois v. Gates*, 426 U.S. 213 (1983) ................................................. 6

*Iowa v. Tovar*, 541 U.S. 77 (1984) ....................................................... 21

*Florida v. J.L.*, 529 U.S. 266 (2000) ................................................... 6, 7

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ................................. 3, 15

*Marshall v. Rodgers*, 569 U.S. 58 (2013) ..................................... 18-19, 24

*Mccoy v. Louisiana*, 584 U.S. 414 (2018) ..................................... 15-16

*Michigan v. Fisher*, 558 U.S. 45 (2009) ............................................. 4, 5

*Navarette v. California*, 572 U.S. 393 (2014) ................................... 7, 8

*Nix v. Williams*, 467 U.S. 431 (1984) ........................................ *passim*

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ................................... 18

*Renico v. Lett*, 559 U.S. 766 (2010) .............................................. 19-20

*Payton v. New York*, 445 U.S. 573 (1980) ........................................ 8

*United States v. Carrion-Soto*, 493 Fed. Appx. 340 (3d Cir. 2012) ................... 12

*United States v. Stokes*, 733 F.3d 438 (2d Cir. 2013) ........................... 8

*United States v. Vasquez*, 149 F.3d 192 (3d Cir. 1988) ....................... 12, 16

*Welsh v. Wisconsin*, 466 U.S. 740 (1984) ......................................... 5

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................. 19

*Wilson v. Sellers*, 584 U.S. 122 (2018) ............................................. 9

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) ................................... 4

## Federal Statutes

28 U.S.C § 2254 ............................................................................. 1, 18

# REPLY ARGUMENT

The police invaded the residence at 26 Hager Street on the basis of an unsubstantiated allegation from an anonymous source who was calling from a pay phone. Counsel never moved to suppress the evidence obtained as a result of the illegal search. The state court unreasonably determined that counsel did not perform deficiently on the basis that the officers reasonably believed that someone within the residence needed emergency aid. Appellees ("the Commonwealth") argue that counsel had good reason not to seek suppression, that the state court reasonably concluded that the circumstances established an exigent situation, and that discovery of the evidence was inevitable. The Commonwealth's arguments misstate the record before the state court and misapplies the controlling law.

Appellant was deprived of his Sixth Amendment right to represent himself at trial despite making a timely an unequivocal request pursuant to *Faretta v. California.* The state court's determination that Appellant was not denied his *Faretta* rights was premised on its conclusion that his request to proceed *pro se* was equivocal. The Commonwealth argues that Appellant is unable to show that the state court's determination was an unreasonable application of clearly established federal law under 28 U.S.C § 2254(d)(1). The Commonwealth's arguments fail. *Faretta* requires that the trial court conduct a colloquy of the defendant following his request to proceed *pro se*. Here, Appellant wrote the court and indicated that he wished to proceed *pro se* if the court failed to appoint

new counsel. The trial court responded to Appellant's request by denying it without conducting any colloquy. Thus, the state court's analysis of Appellant's request departed from *Faretta*'s requirement that a defendant who requests to proceed *pro se* be colloquied by the court on the issue. Because no colloquy occurred here, the state court's decision is an unreasonable application of federal law as defined by the Supreme Court. The Commonwealth's arguments concerning Appellant's subsequent comments about his lawyer on the eve of trial are also unavailing because they in no way remedy the trial court's failure to conduct a colloquy in response to Appellant's unequivocal request to proceed *pro se* at trial.

## I. THE STATE COURT UNREASONABLY DETERMINED THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO MOVE TO SUPPRESS EVIDENCE DERIVED FROM THE WARRANTLESS ENTRY AND SEARCH OF THE DAVIDO HOME.

As an initial matter, the Commonwealth's brief is replete with facts that are outside the state court record. 28 U.S.C. § 2254(d)(2). In fact, none of the evidence to which the Commonwealth refers—third party attestations to police about later-developing facts that were not testified to at trial and have never been used to support the Commonwealth's case—was presented by the Commonwealth in state court.

The entire premise of the Pennsylvania Supreme Court's rejection of the ineffective assistance of counsel claim was its finding that Appellant's underlying Fourth Amendment claim was meritless. Exalting form over substance, the Commonwealth

2

misconstrues Appellant's presentation of the claim as a "stand-alone" Fourth Amendment claim. Appellee's Br. at 12. On the contrary, Appellant's claim is that reasonably competent counsel would have moved to suppress the evidence derived from the illegal search, and that trial counsel was ineffective for failing to do so. *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986). Appellant's ineffective assistance of counsel claim "focuses on the underlying Fourth Amendment claim," Appellee's Br. at 18, because the Supreme Court requires "prov[ing] that [the] Fourth Amendment claim is meritorious." *Kimmelman*, 477 U.S. at 375, 382, and indeed the Pennsylvania Supreme Court's denial of the ineffectiveness claim rests exclusively on its determination regarding the underlying Fourth Amendment issue. *See* Appellant's Br. at 29, 30. Nor did Appellant "skip" the *Strickland* analysis, as the Commonwealth contends. Appellee's Br. at 14. Rather, as is necessary to establish counsel's ineffectiveness, he was proving that the warrantless entry and search of his home was a meritorious claim of a Fourth Amendment violation.

The state court unreasonably determined that counsel did not perform deficiently because the officers believed emergency aid was needed, and rejected Appellant's ineffectiveness claim solely on that basis. Its determination of the ineffectiveness claim is owed no deference under AEDPA and this court may review the remaining aspects of that claim de novo.

3

**A.** **The Pennsylvania Supreme Court's decision that there were exigent circumstances was contrary to and an unreasonable application of clearly established federal law**.

Appellant argued in the initial brief that the Pennsylvania Supreme Court's decision was based on an unreasonable determination of the facts in light of the state court record. Appellant's Br. at 31; 28 U.S.C. § 2254(d)(2). The Commonwealth never addresses, let alone refutes, that the state court unreasonably found a "separate report" about screaming when there was only one single anonymous 911 call or that the state court unreasonably relied on "fairly specific details" in the 911 call when the *only* fact that the officers were able to verify was that the residence the caller identified at 26 Hager Street actually existed. Appellant's Br. at 31; A286 at p.44; A243-A244 (transcript of Trial Ex. 911 call).

Instead, the Commonwealth argues that "Supreme Court precedent gives no clear answer" as to whether the state court's decision was unreasonable. Appellee's Br. at 24, 25. But, in *Yarborough v. Alvarado*, 541 U.S. 652 (2004), the Supreme Court held that "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Id.* at 666. Where, as here, the invoked exigent exception is emergency aid, the test is clearly established that the officers must have an objectively reasonable basis for believing that a person within the house is in need of immediate aid because they are seriously injured or threatened

4

with such injury. *Brigham City v. Stuart*, 547 U.S. 398, 404, 406 (2006); *Michigan v. Fisher*, 558 U.S. 45, 49 (2009).

The Commonwealth concedes that "[t]he officers didn't see Davido punching the victim, as in *Brigham City*, they didn't hear a [sic] Davido raging in the house, as in *Michigan v. Fisher*," Appellee's Br. at 32, but contends the dispute hinges on the fact that from the officers' perspective, "[t]he silent house was suspicious." Appellee's Br. at 31. Under the Commonwealth's characterization of the circumstances upon arrival at the home, the officers saw and heard nothing suggesting that a man was beating a woman inside the residence, let alone anything approaching the loud and violent brawl in *Brigham*, or the bloody fight in *Fisher*. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006); *Michigan v. Fisher*, 558 U.S. 45, 47-48 (2009). The caller's allegation was unsubstantiated. Without an objectively reasonable basis to believe emergency aid was needed, the officers were required to obtain a warrant to enter the house.

The Commonwealth suggests that *Welsh v. Wisconsin* permits weighing the "gravity" of the allegation, regardless of whether it is verified. Appellee's Br. at 17 (citing to *Welsh v. Wisconsin*, 466 U.S. 740 (1984)). But *Welsh* concerned a warrantless entry into the home to effect an arrest when there is probable cause to believe that a traffic offense was committed, not the emergency aid exigency exception. The officers in *Welsh* had probable cause that a crime was committed, and they were effectuating a warrantless home arrest. 466 U.S. at 753. In a similar vein, the Commonwealth suggests that

allegations involving "danger" alleviate the requirements of *Brigham* and *Fisher* under *Florida v. J.L.* Appellee's Br. at 17, 26. But *J.L.* involved a *Terry* stop based upon an anonymous tip that a person was carrying a gun and held that "an automatic firearm exception to our established reliability analysis would rove too far." *J.L.*, 529 U.S. at 272. Such an exception "would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." *Id.*, 529 U.S. at 272. While the Court left open the question of whether a search could be justified without a showing of reliability if it was reported that a "person [is] carrying a bomb" or the tip concerned public safety officials in airports and schools, "quarters where the reasonable expectation of Fourth Amendment privacy is diminished," *id.* at 273-274, dangers to public safety are not at issue in Appellant's case.

The Commonwealth mischaracterizes Appellant's argument as "saying that the officers needed 'ironclad proof'" of exigency. *Id.* at 28. That is not the case. Rather, an objectively reasonable belief requires more than an unsubstantiated allegation. In the context of probable cause determinations, "ratification of the bare conclusions" from anonymous sources does not satisfy probable cause absent at least partial corroboration of the information from "independent investigative work." *Illinois v. Gates*, 426 U.S. 213, 239 (1983). And, as Appellant argued in the initial brief, in the context of reasonable

6

suspicion for *Terry* stops, *Florida v. J.L.* held that unsubstantiated allegations from an anonymous source do not generate reasonable suspicion. Appellant's Br. at 20.

In *J.L.*, the anonymous source "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *J.L.*, 529 U.S. at 271. The fact the allegation was revealed to be correct was irrelevant, because the only relevant information was that known to the officers before the search. *Id.* By contrast in *Alabama v. White*, 496 U.S. 325, 327, the anonymous caller reporting cocaine transportation told the officers that "a woman would drive from a particular apartment building to a particular motel in a brown Plymouth station wagon with a broken right tail light," which was confirmed by the officers. *Id.*

*J.L.* undoubtedly governs the analysis. The names of the man and woman involved in the domestic dispute were unknown. The anonymous caller gave the police no information they could corroborate apart from the suspicious activity that was reported. And they had no reason to believe the information was supplied by someone familiar with the affairs of the house. There was no unique detail as in *White*. And, while the use of the 911 system can indicate veracity because "a reasonable officer could conclude that a false tipster would think twice" before using a system that allows for identifying and tracing callers, here the caller used a payphone to conceal their identity. *Navarette v. California*, 572 U.S. 393, 399 (2014). And, the caller was clearly not an

eyewitness, *id.* at 398-99, because the dispatch reported that "*it was believed* that a man was hitting a woman." Appellant's Br. at 9; A295 at p.80 (emphasis added).

Indeed, the state court even acknowledged the possibility that the caller "was in error or not genuine," *Davido-2*, at 624—which the Commonwealth likewise acknowledges was "perhaps" the case, *see also* Appellee's Br. at 27. The doubtful or debatable nature of the exigency at best provided grounds for unsubstantiated suspicion. It certainly does not provide an objectively reasonable basis to believe that immediate aid was needed. If, in the context of *Terry* stops, "[a] mere 'hunch' does not create reasonable suspicion," *Navarette*, 572 U.S. at 397, then an officer's "gut feeling," Appellee's Br. at 29, cannot justify invading "the sanctity of a man's home," which "has been embedded in our traditions since the origins of the Republic." *Payton v. New York*, 445 U.S. 573, 585, 601 (1980).

## B.    Inevitable discovery should be decided *de novo*.

In the initial brief, Appellant argued that because the Pennsylvania Supreme Court expressly disavowed any reliance on the inevitable discovery exception, a *de novo* standard of review applies under *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 283-84 (3d Cir. 2016) (en banc). Appellant's Br. at 24. Contrary to the Commonwealth's assertion, this is not a "classic example of inevitable discovery." Appellee's Brief at 4. The "sheer number of contingencies that may not have been resolved in the government's favor 'undermin[es] the conclusion that discovery of the evidence

pursuant to a lawful search was inevitable.'" *United States v. Stokes*, 733 F.3d 438, 448 (2d Cir. 2013) (internal citations omitted). The Commonwealth fails to prove by a preponderance of the evidence that the decedent's body would have been discovered in the same condition as it was actually found, as is required under *Nix v. Williams*, 467 U.S. 431, 444 (1984).

The Commonwealth now argues that this Court is constrained from assessing inevitable discovery *de novo*,[1] and should "look through" to the trial court's decision under *Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008), because the Pennsylvania Supreme Court "ruled on only one piece of a multi-prong standard." Appellee's Br. at 10-11. But inevitable discovery is not a "prong" of the *Strickland* standard. Rather, it is an "alternative ground" supporting the state court's ruling as to deficient performance. *Dennis*, 834 F.3d at 285. In *Bond v. Beard*, the state court resolved the ineffectiveness claim on the deficient performance prong. 539 F.3d at 289. Lacking a ruling on the prejudice prong, this Court "look[ed] through" the unreasoned opinion to the PCRA court's determination as to prejudice. *Id.* at 290. "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion […]

---

[1] We note that the Commonwealth did not rely on this argument below. *See* Response to Pet. 102-112, ECF No. 134, A210-A221. Nor did the district court address it. *See* DCO at *31-34, A66-A73.

9

a federal habeas court simply reviews the specific reasons given by the state court . . . ."
*Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

Here, the last state court to decide the deficient performance prong of *Strickland* resolved it on the grounds that counsel did not perform deficiently because exigent circumstances existed. *Davido*, 106 A.3d at 241. The deficient performance decision did not encompass inevitable discovery because, as the court explained, exigency was dispositive. *Id.* Where, as here, the state court issued a reasoned opinion, the federal courts must subject the state court's specific reasoning to analysis under 28 U.S.C. 2254(d). *See Dennis*, 834 F.3d at 284. And, because inevitable discovery was an alternative ground supporting the state court's judgment as to deficient performance, *de novo* review applies. The Commonwealth now argues that "the question was different" in *Dennis*, and that gap-filling is "not what is happening here." Appellee's Br. at 11. Regardless, "when a state court ruling is based on a reasoned, but erroneous, analysis, federal habeas courts are empowered to engage in an alternate ground analysis—relying on any ground properly presented—but, in such a case, the federal court owes no deference to the state court." *Dennis*, 834 F.3d at 283. That is the case here. The State court's ruling as to deficient performance here "articulated its own clear reasoning" that its basis for rejecting deficient performance was because the circumstances were exigent, and this Court should review *de novo* the "alternative

ground" for resolving deficient performance based on whether discovery was inevitable. *Id.*

Even if this Court decides to "look through" to the Pennsylvania PCRA court's decision, it owes no deference under 28 U.S.C. § 2254(d)(1). The Pennsylvania PCRA court cited to *Nix*, but conducted none of the requisite analysis. *Nix* clearly established that the government has the burden of proving by a preponderance of the evidence that the decedent's body would have been discovered by lawful means in the same condition as it was actually found. *Nix*, 467 U.S. at 444. The lawful means analysis "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444 n. 5. The alternative means in *Nix* was a grid search that was already underway and independent of the discovery of the body through unlawful police conduct. The Pennsylvania PCRA court disregarded the burden of proof and the requirement of engaging with historical facts without speculation. It simply reiterated that police investigation "would have led to discussions with members of the house to determine if the 911 call was legitimate. Therefore, the gut feeling of the officers at the scene in addition to the procedure for domestic violence calls would have inevitably led to the discovery of Angelina Taylor's body and other evidence found at 26 Hager Street. As a result, the evidence would not be excluded [.]" District Court App., Vol. 1, ECF No. 94, A241.

Instead of assessing alternative avenues for lawful investigation that would have resulted in discovery of the same evidence the police found through the unlawful entry, as *Nix* requires, the Pennsylvania PCRA court analyzed the kind of investigation the officers could have conducted that would have justified a warrantless entry into the house—the "police procedure in response to a domestic violence call," that could have entailed "discussion with the members of the house to determine if the 911 call was legitimate." District Court App., Vol. 1, ECF No. 94, A240-41. The court's conclusion that "the gut feeling of the officers at the scene in addition to the procedure for domestic violence calls would have inevitably led to the discovery" of the decedent's body and other evidence at Hager Street unreasonably applied *Nix*. The PCRA court did not engage in a discussion of any of the other evidence uncovered by the unlawful conduct besides the body.

The Pennsylvania PCRA court and the Commonwealth's analysis suffers from the same defect of failing to articulate non-speculative facts. In *Nix,* the lawful alternative investigation "had been initiated" before the police illegally obtained a statement from the defendant guiding them to the body and terminating the search. *Nix*, 467 U.S. at 431. Thus, courts must be "viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *United States v. Vasquez DeReyes*, 149 F.3d 192, 195 (3d Cir. 1998). Here, there are no historical facts that establish, with no speculative elements, that the derivative

evidence would have been inevitably discovered by lawful actions by police independent of the unlawful entry.

The Commonwealth's reliance on conversations with witnesses that occurred *after* police were on the scene, *after* the entry took place, *after* Ms. Taylor was found, and *after* an ambulance was already on the scene, Appellee's Br. at 39-40, is tainted by the assumption that these individuals would behave the same way under any set of circumstances and variables. Guessing what police "would certainly have" done and speculating how witnesses have responded deviates from the clearly established standard for evaluating inevitable discovery. *Id.* at 39.

Even "best practices" by police cannot be presumed in the absence of relevant police procedure proffered by the Government that would have mandated discovery. *See United States v. Carrion-Soto*, 493 Fed. Appx. 340, 340-43 (3d Cir. 2012); *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998). The Commonwealth fails to point to any Lancaster Police Department protocol for entering and sweeping a house after one uncorroborated, anonymous 911 call reporting a domestic dispute in order to confirm or deny the report.

The Commonwealth's claim that this case is "on all fours with *Nix v. Williams*," Appellee's Br. at 32, is thus incorrect, because the Commonwealth cannot point to any historical fact that supports an alternative avenue for lawful discovering the decedent's body or other evidence learned as a result of their unlawful entry. Instead, the

Commonwealth lists a host of possible outcomes had the police not unlawfully entered. Appellee's Br. at 40. Yet, the very existence of a list of potential developments reveals that the Commonwealth is theorizing about what could have happened, who would have found the decedent, what they would have done, and what information they would have shared with the police.

None of the reasons advanced by the Commonwealth on Appellee's Br. at 32-36 can be found in the Pennsylvania PCRA court's opinion. For that reason alone they should be rejected. Moreover, the instant situation does not compare to *Nix*. Family members are not presumed to preserve a crime scene with care, nor do we know what evidence the family would have come to possess if they were left to discover the body. By contrast, while *Nix* involved citizen volunteers, they were part of a systematic grid search of the area, *Nix*, 467 U.S. at 431, initiated by the Iowa Bureau of Criminal Investigation, *id*. at 435, and organized and directed by a Bureau agent. *Id*. at 449. The Commonwealth ignores police procedure noted in *Nix*, dismisses the importance of the already-underway, methodical search set to cover the area, and ignores the mandate that only demonstrated historical facts, without any speculative elements, be used to determine whether the inevitable discovery doctrine actually applies.

In contrast here, the Commonwealth relies on the unpredictable actions of defendant's family members, who in the Commonwealth's words, "fled," "ran," and "rushed," Appellee's Br. at 34-35, and, as the state court's findings make clear, were

involved in the events that precipitated the homicide and had abandoned the scene as

the events were unfolding that morning. As the state court found:

> Appellant's mother, sisters, brothers, and the girlfriend and
> children of Appellant's brother, Spanky Davido, also resided there.
> On Sunday morning, May 14, 2000, an argument arose between
> Appellant and Ms. Taylor deriving from his suspicion that she had
> engaged in oral sex with Spanky Davido . . . . Ultimately, all of
> Appellant's relatives left the residence, taking Ms. Taylor's son with
> them, leaving only Appellant and Ms. Taylor inside.

*Davido-2* at 616. Predicting the actions of Appellant's family members—indeed, the

Commonwealth lists Appellant's "brother Spanky" among those akin to the volunteers

in *Nix*—in the absence of the police search involves too many contingencies to assume

the follow-up steps they would have taken, or would have delayed taking, their capacity

for  veracity or candor or deception if confronted with suspicion by police, and how

that would have contributed to the condition of the scene or the decedent's body. It

thus requires the kind of speculation prohibited by *Nix*.

### C.    **Deficient** Performance

Trial counsel's testimony is dispositive of the reason he failed to move to suppress evidence derived from the warrantless search. Sworn testimony at the PCRA hearing demonstrated that Mr. Gratton had no tactical or strategic reason for not raising a challenge to the evidence obtained as a result of the warrantless entry. NTP 262. The Commonwealth now argues that consideration of this "testimony is not necessary," Appellee's Br. at 46. But his testimony should not be supplanted by the Commonwealth's speculation about counsel's strategy.

The Commonwealth contends that counsel "believed that the motions would be denied," *id.* at 43, "accurately determined that this issue would not have prevailed before the trial court," Appellee's Br. at 44, was influenced by Appellant's desire to exhume the body, *id.* at 45, and reasonably prioritized suppressing Appellant's incriminating statements to police, *id.* at 46-47. None of the reasons supplied by the State can be credited to counsel. And reliance on hindsight, such as the PCRA court's adverse ruling, is contrary to *Strickland*, which requires evaluating "the conduct from counsel's perspective at the time." *Kimmelman*, 477 U.S. at 386-87.

Counsel's responsibility was neither constrained by, nor incompatible with, Appellant's wishes to exhume the body or other priorities in the case. While the "objective of the defense" is a decision reserved for the client, counsel is entrusted with decisions regarding "what arguments to pursue, what evidentiary objection to raise, and

what agreements to conclude regarding the admission of evidence." *Mccoy v. Louisiana*, 584 U.S. 414, 422 (2018). Suppression of evidence precludes the Commonwealth's affirmative use of the evidence in its case in chief; it does not render information or evidence unavailable to the defense. Nor was Appellant aware of an avenue to acquittal. He was not informed of the meritorious suppression issue, since counsel admittedly failed to consider it. Appellant is not a lawyer. He did not know, but suspected, that police were not allowed to enter the house as they did. NTT 673-74. Without adequate advice by counsel, Appellant's wishes regarding the evidence are irrelevant to determining whether counsel was deficient. And nothing suggests that Appellant would have opposed litigating the suppression issue, since it did not preclude pursuing the defense that he purportedly desired. Particularly where, as here, counsel in fact moved to suppress some evidence on other grounds—counsel moved to exclude evidence obtained from the search of Appellant's house pursuant to a search warrant. Resp. Pet for Habeas Corpus 2, ECF No. 134.

**D.    Prejudice.**

The Commonwealth argues that Appellant has not identified the evidence to be suppressed. This is false. Appellant has repeatedly represented that the derivative evidence would be excluded, including evidence of the body, Appellant's flight from police, discovery of eyewitnesses, Appellant's statements, physical evidence later examined to establish rape, and seizure of numerous physical items. The prejudice

argument is straightforward because the Commonwealth would not have had sufficient evidence to convict Appellant if trial counsel had brought an appropriate suppression motion. *See Nix v. Williams*, 467 U.S. at 448 (citing *Killough v. United States*, 315 F.2d 214 (D.C. Cir. 1962)) (noting that the exclusionary rule may validly require suppression of a dead body in a murder prosecution). If trial counsel performed effectively, there is a reasonable probability that incriminating evidence would have been suppressed and that, in its absence, at least one juror would have harbored a reasonable doubt as to first degree murder.

Additional evidence, other than the body, seized pursuant to the illegal entry and search of the house, including officer observations, impressions of Appellant and his flight, identification of eyewitnesses, and statements from Appellant was used not only to convict him of homicide, but also of rape, which established the aggravating circumstance that exposed him to a death sentence. Suppression of that evidence would have led not only to a different result at the guilt phase but also the penalty phase. There is a reasonable probability that at the sentencing phase, at least one jury would have declined to find the aggravator, and Appellant would not have been sentenced to death.

## II.    APPELLANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO REPRESENT HIMSELF AT TRIAL

The Commonwealth's argument rests largely on its position that Appellant is unable show that the state court's determination was an unreasonable application of clearly established federal law. The Commonwealth suggests that the Supreme Court in

*Faretta* merely set forth a "general standard" and "never explicitly addressed what it means for a defendant to unequivocally assert his right to counsel." For this reason, the Commonwealth argues that there is no scenario by which Appellant can establish that the state court's determination of the issue is an unreasonable application of clearly established federal law. Under the Commonwealth's theory, any factual and legal determination by the state court using any standard that it imagines must be deemed reasonable and must not be subject to habeas review because the Supreme Court has not explicitly defined the word "unequivocal," even when the state court misrepresented the underlying facts in its application of a "totality of the circumstance" analysis to determine that Appellant's request to proceed pro se was "equivocal." The Commonwealth's argument fails for several reasons. The state court unreasonably applied clearly established federal law under *Faretta*, and unreasonably applied the facts.

First, the Commonwealth's position that the "unreasonable application" prong precludes habeas review of the state court's decision because the Supreme Court has not explicitly defined the word "equivocal" is wrong. The Supreme Court has made clear with respect to 28 U.S.C § 2254(d)(1)'s unreasonable application prong that "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute

recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citations and internal quotation marks omitted). *See also Marshall v. Rodger*s, 569 U.S. 58, 62 (2013) ("[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since a general standard from this Court's cases can supply such law.") (citing *Yarborough*, 541 U.S. at 664); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (Supreme Court precedents "have made clear" that a state-court decision may be "unreasonable" within the meaning of § 2254(d)(l) when the "state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced'") (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

The Commonwealth also wrongly suggests that Appellant cannot look at circuit court precedent in demonstrating that the state court's determination was an unreasonable application of clearly established federal law. The Supreme Court has made clear that circuit court precedent can provide insight on whether a state court decision was an unreasonable application of clearly established Supreme Court law. *See Renico v. Lett*, 559 U.S. 766, 796 (2010) (Stevens, J., dissenting) ("lower court[]" practice of "routinely look[ing] to circuit cases to 'provide evidence that Supreme Court precedents ha[ve] clearly established a rule as of a particular time or [to] shed light on the "reasonableness" of the state courts' application of existing Supreme Court

precedents' … is a healthy practice—indeed, a vital practice, considering how few cases this Court decides—and we have never disapproved it"; *Marshall v. Rodgers*, 569 U.S. at 64 ("[A]n appellate panel may, in accordance with its usual law-of the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent…."); *O'Laughlin v. O'Brien*, 568 F.3d 287, 304–05 (1st Cir. 2009), *cert. denied*, 558 U.S. 1158 (2010) ("although we evaluate the state court decision in light of Supreme Court precedent, we are not precluded from looking at other federal court decisions that may help guide us in applying the *Jackson* [*v. Virginia*] standard"). Indeed, as discussed in his initial brief, state court rulings on the "clear and unequivocal" issue are subject to § 2254(d)(1), and several circuit courts have granted habeas relief for unreasonable applications of *Farretta* on this basis. Those decisions are instructive here. *See Tamplin v. Muniz*, 894 F.3d 1076, 1084 (9th Cir. 2018) (state court decision request was equivocal was contrary to *Faretta*); *Freeman v. Pierce*, 878 F.3d 580, 588 (7th Cir. 2017) (state court ruling on "clear and unequivocal" was an unreasonable application of *Faretta*); *Jones*, 414 F.3d at 593 (same).

Thus, Appellant is not precluded from establishing that the state court's decision was an unreasonable application of *Faretta's* "clear and unequivocal" standard.

Furthermore, the state court's decision misapplies the standards set forth in *Faretta*. The Supreme Court in *Faretta* explicitly identified procedures that courts must

follow in determining whether a defendant can exercise the right to proceed *pro se*, and the state court here failed to follow those procedures. In *Faretta*, the Supreme Court recognized that the trial court conducted a necessary colloquy of Mr. Faretta in response to his request to proceed *pro se*. The colloquy confirmed that Faretta's request was not equivocal. Had the trial court in *Faretta* found a legitimate problem with his request during the colloquy, the court could have rightly determined that his request was equivocal. Here, there was no such inquiry from the trial court. Other than Appellant's October 15 written request to proceed *pro se* if not appointed another attorney, the record is silent. The court simply acknowledged and summarily denied Appellant's request without colloquy or inquiry. The state court's "totality of the circumstance" analysis departed from the requirement established in Faretta that a defendant who requests to proceed *pro se* be colloquied by the court on the issue. Because that did not happen here, the state court's decision is an unreasonable application of federal law as defined by the Supreme Court.

It is revealing that the Commonwealth does not acknowledge that *Farretta* requires a colloquy of a defendant who requests to proceed *pro se*, that the trial court here did not conduct a colloquy of Appellant, and that the state court omitted the lack of a colloquy from its analysis. The Commonwealth cites *Iowa v. Tovar*, 541 U.S. 77 (1984), for the proposition that a defendant must be warned about the hazards of proceeding *pro se* before waiving counsel, but it fails to acknowledge that Mr. Tovar was

colloquied twice separately before being allowed to represent himself without counsel at both the guilty plea and sentencing. Thus, rather than address *Faretta's* requirement that a court colloquy a defendant to ensure that the defendant understands the associated risks with proceeding *pro se* and that his request to proceed *pro se* is unequivocal, the Commonwealth attempts to obfuscate by arguing that there is no set path in federal law to determining what "equivocal" means. But that argument is a red herring that would have this court ignore what transpired in *Faretta* itself.

Appellant is not arguing, as the Commonwealth suggests, that the state court was wrong because it applied the "wrong factors" in concluding that his request was not unequivocal. Appellees Br. at 61. Rather the state court's decision involved an unreasonable application of Sixth Amendment law because it both misapplied *Faretta and* "mischaracterize(d) crucial details and omit(ed) others" in reaching a conclusion that was unreasonable in light of the state court record. In other words, the "factors" the state court relied upon were belied factually by the state court record and were unreasonable application of the standard set forth in *Farretta*.

As discussed at length in the initial brief, the state court erroneously concluded that Appellant's request to represent himself was used merely as a "bargaining device, rather than as a clear demand for self-representation." The Commonwealth mischaracterizes Appellant's claim as an attack on the state court's "factors" and so never addresses the substance of Appellant's argument: that the state court's

23

determination on this point is unreasonable because there is nothing in the record to support it. There is simply no evidence that Appellant's intent in requesting to represent himself was a ploy to strongarm the trial court into appointing substitute counsel. The state supreme court's supposed consideration of this "factor" is based entirely on unsupported speculation. In the absence of the colloquy required by *Faretta*, the state court was not in a position to determine that Appellant's request was anything other than a legitimate unequivocal request to proceed *pro se*. By summarily denying Appellant's written request without a colloquy, the trial court precluded the state court from considering this as an equivocal "bargaining chip" request. Whether or not the "bargaining chip" theory was merely a "factor" in the state court's analysis is irrelevant, because facts supporting the court's conclusion do not exist in the record. Thus it was unreasonable for the state court to conclude that Appellant's request was merely a bargaining chip, and unreasonable to rely upon it in deciding Appellant's right to self-representation was not violated.

The same holds true for the state court's determination that Appellant's request was equivocal because, on the first day of trial, he "clearly indicated that he did not want to represent himself." As discussed at length in the initial brief, Appellant's conduct weeks after his written request to proceed *pro se* was summarily denied cannot determine whether he previously made an unequivocal request. The Commonwealth argues that it was proper for the state court to consider this because "the trial court believed that

Davido's letter was really about dissatisfaction with counsel. And Davido later confirmed that." Appellees' Br. at 65. But this too, relies entirely on speculation and *post hoc* rationalization. There are a myriad of reasons why Appellant might have told the court that he was satisfied with proceeding to trial with counsel at that point time. Consider that the trial was starting and Appellant knew well from the court's prior denial that he could neither represent himself nor obtain new counsel, it would be foolish and against self-interest to attack the lawyer who undoubtedly would be defending his life in a capital murder trial. The Commonwealth argues that Appellant's subsequent requests to have the body exhumed and to "raise other claims relating to certain photos" as proof that "his time had run out is entirely disingenuous." The Commonwealth posits that these requests undermine Appellant's position that he made them after the time that at the last minute because he could exercise a meaningful right of self-representation at that point. But the opposite interpretation is the only reasonable one that Appellant made those requests on the eve of trial because his *pro se* request had been denied, he was dissatisfied with counsel, and he was resorting to his last and only option to ensure important aspects of his defense were carried out—asking the court directly. In other words, Appellant knew that he was stuck with counsel but held out hope that the court might take action on his motions.

In any event, a statement from Appellant in response to post-hoc question from the court, weeks after summarily denying the *pro se* request, is not relevant to the trial

court's failure to comply with *Faretta* at the time Appellant's request was made and denied. The state's court's reliance on this is an unreasonable application of federal law.

The Commonwealth argues that *Marshall v. Rodgers*, 569 U.S. 58, demonstrates that the Pennsylvania Supreme Court's determination was not contrary to clearly established law on the issue of "equivocation." However, *Marshall* is distinguishable both factually and legally from the analysis here. Unlike Appellant's case, *Marshall* concerned whether a defendant who vacillated on several occasions about whether to proceed pro se or with counsel had a Sixth Amendment right to have counsel appointed in post-verdict proceedings. Specifically, the question presented was whether Marshall had a Sixth Amendment right to counsel after having previously waived that right. The Supreme Court determined that the state court's resolution of whether the defendant was entitled to appointed counsel after his previous waivers was not at odds with clearly established law federal law. Appellant's case presents a different scenario and different questions: whether the state court unreasonably determined that Appellant's right to proceed *pro se* was not violated under *Faretta*, where the state court engaged in no colloquy before denying Appellant's request and there was no record basis upon which to conclude, as the state court did, that Appellant's request was merely a "bargaining" tool and not an unequivocal request to proceed pro se. Here, as discussed at length in this brief, the state court's determination unreasonably determined the facts and unreasonably applied *Faretta's* standards. Nor is Appellant relying on circuit court

decisions as establishing the federal law. *Faretta*, not *Marshall*, sets forth the applicable law here, which the state court failed to follow.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court's judgment and remand with instructions to grant Appellant's petition for writ of habeas corpus, and vacate his conviction and sentence of death.

Respectfully submitted,

/s/ Eric J. Montroy
ERIC J. MONTROY
SONALI SHAHI
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Appellant, Tedor Davido*

Dated: November 12, 2024

## CERTIFICATE OF BAR MEMBERSHIP

I, Eric Montroy, hereby certify that I am employed as an attorney with the

Federal Community Defender for the Eastern District of Pennsylvania.


*/s/ Eric J. Montroy*
Eric Montroy

Dated:  November 12, 2024

# CERTIFICATE OF COMPLIANCE

I, Eric J. Montroy, hereby certify that this Reply Brief for Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it consists of 6,484 words.

*/s/ Eric J. Montroy*
Eric J. Montroy

Dated: November 12, 2024

## CERTIFICATE OF SERVICE

I, Eric J. Montroy, hereby certify that I have filed electronically the Initial Brief for Appellant and Appendix and served copies upon filing user Susan Affronti, Esq., through the Court's Electronic Case Filing system.

/s/ Eric J. Montroy
Eric J. Montroy

Dated: November 12, 2024